IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

ANTONIO AGUILAR,
    Petitioner,

vs.                                      Case No.:  5:05cv112/RS/EMT

JAMES R. McDONOUGH,[1]
    Respondent.
_____/

## ORDER, REPORT AND RECOMMENDATION

      Before the court is an amended petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (Doc. 4).  Respondent filed a combined motion to dismiss the petition and an answer (Doc. 15).  Petitioner filed a reply (Doc. 18).  This matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(b).  After careful consideration, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter.  It is further the opinion of the undersigned that the pleadings and attachments before the court show that although the petition is timely, Petitioner is not entitled to relief.

I.      BACKGROUND

      On September 14, 2000, following a jury trial, Petitioner was found guilty in the Circuit Court in and for Bay County, Florida, of sexual battery on a child under the age of 12 (Doc. 16, Ex. A at 70).  On October 23, 2000, Petitioner was adjudicated guilty and sentenced to life imprisonment without parole (*id*. at 118-22).  Petitioner appealed his conviction and sentence to the Florida First District Court of Appeals (First DCA) (*id*., Exs. F, G, H).  The First DCA affirmed the conviction

---

[1]James R. McDonough succeeded James Crosby as Secretary for the Department of Corrections, and is automatically substituted as Respondent.  *See* Fed. R. Civ. P. 25(d)(1).

without opinion on November 19, 2001, with the mandate issuing December 5, 2001 (*id.*, Ex. I). Aguilar v. State, 799 So. 2d 1026 (Fla. 1st DCA 2001) (Table).

On December 2, 2002, Petitioner filed a motion for post-conviction relief with the trial court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Doc. 16, Ex. J at 153-207)). Following an evidentiary hearing, the trial court denied the postconviction motion on September 24, 2003 (*id.*, Ex. K at 219-21). Petitioner appealed the decision to the First DCA (*id.*, Exs. S, T). The First DCA affirmed the decision per curiam without opinion on March 9, 2005, with the mandate issuing March 28, 2005 (*id.*, Ex. W). Aguilar v. State, 895 So. 2d 1068 (Fla. 1st DCA 2005) (Table). On March 28, 2005, Petitioner filed a Motion for Rehearing/Request for Written Opinion, which was denied by the First DCA on April 25, 2005 (Doc. 16, Exs. V, X).

Petitioner filed the instant habeas action on May 26, 2005[2] (*see* Doc. 1 at 7). He asserted two grounds for relief:

    1.    Ineffective assistance of counsel for failure to properly impeach a key state witness; and

    2.    Denial of due process due to admission of improper expert testimony.

(Doc. 1 at 5). In his amended petition, Petitioner deleted Ground two and asserted only the ineffective assistance of counsel claim (Doc. 4 at 4).

II.    TIMELINESS

Respondent contends the petitions should be dismissed as untimely. Pursuant to the requirements set forth in 28 U.S.C. § 2244, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L.No. 104-132, 110 Stat. 1214, which became effective on April 24, 1996, a one year period of limitation applies to the filing of habeas petitions by person in custody pursuant to a state court judgment. The limitation period runs from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

---

[2] Both Respondent and Petitioner assert that Petitioner's federal habeas petition was filed on July 5, 2005 (*see* Doc. 15 at 9; Doc. 18 at 6). However, that is the date that Petitioner's counsel filed a notice a appearance, not the date the petition was filed. The petition was signed by Petitioner on May 10, 2005, but there is no indication when it was provided to prison officials for mailing (*see* Doc. 1). The petition and the filing fee were received by the court from Petitioner's counsel's law firm on May 26, 2005 (*see* receipt attached to Doc. 1), thus, the court will consider that as the date of filing of the federal petition.

Case No.: 5:05cv112/RS/EMT

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Section 2244(d)(1).

In the instant case, Petitioner does not assert that a government-created impediment to his filing existed, that he bases any of his claims on a right newly recognized by the Supreme Court, or that the facts supporting his claims could not have been discovered through the exercise of due diligence before the filing of this petition. Thus, the statute of limitations must be measured from the remaining statutory trigger, which is the date on which his conviction became final. *See* 28 U.S.C. § 2244(d)(1).

It is now well established that when a Florida defendant directly appeals his conviction but does not seek certiorari review of the decision affirming the conviction, the one-year limitations period for filing a federal habeas petition begins to run ninety (90) days after issuance of the appellate court's decision.[3] Nix v. Secretary for the Dep't of Corrections, 393 F.3d 1235, 1236-37 (11th Cir. 2004) (citing Bond v. Moore, 309 F.3d 770 (11th Cir. 2002)); Jackson v. Secretary for the Dep't of Corrections, 292 F.3d 1347, 1349 (11th Cir. 2002); *accord* Clay v. United States, 537 U.S. 522, 525, 123 S. Ct. 1072, 1075, 155 L. Ed. 2d 88 (2003); Close v. United States, 336 F.3d 1283, 1284-85 (11th Cir. 2003). In the instant case, the First DCA issued its decision affirming Petitioner's conviction on November 19, 2001. Petitioner did not seek review of his conviction in the Florida Supreme Court or in the United States Supreme Court, thus, Petitioner's one-year limitations period began to run on February 17, 2002, upon expiration of the 90-day period for seeking certiorari review.

---

[3]The 90-day period for filing in the United States Supreme Court a petition for writ of certiorari seeking review of a decision of a state appellate court runs from the date of the state court's opinion. *See* Sup. Ct. R. 13.3.

Case No.: 5:05cv112/RS/EMT

This court must next address whether the limitations period was tolled pursuant to statutory or equitable tolling principles.

Section 2244(d)(2) provides:

> The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

The United States Supreme Court held that "an application is 'properly filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings." Artuz v. Bennett, 531 U.S. 4, 8, 121 S. Ct. 361, 364, 148 L. Ed. 2d 213 (2000). State laws and rules "usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee." *Id.* (citations omitted).

An application for post-conviction relief is pending "until the application has achieved final resolution through the State's post-conviction procedures." Carey v. Saffold, 536 U.S. 214, 219-20, 122 S. Ct. 2134, 2138, 153 L. Ed. 2d 260 (2002). In Saffold, the Court held that the time an application for post-conviction relief is "pending" includes the period between (1) a lower court's adverse determination, and (2) the prisoner's filing of a notice of appeal, provided that the notice of appeal is timely under state law. Saffold, 536 U.S. at 223. The system in California, which was at issue in Saffold, had engrained original writs into its normal collateral review process whereby the only avenue for a prisoner to challenge the lower court's denial of a post-conviction application was to file a "new petition" in the appellate court; and to challenge the appellate court denial, the prisoner could seek review in the state supreme court by filing either a new petition for habeas corpus or a petition for hearing. *Id.* at 224-25.

Two Eleventh Circuit cases are relevant to this discussion, Wade v. Battle, 379 F.3d 1254 (11th Cir. 2004) and Jones v. Nagle, 349 F.3d 1305 (11th Cir. 2003). In Wade, the Eleventh Circuit quoted the Saffold Court's view that a case is pending "until the application has achieved final resolution through the State's post-conviction procedures . . . ." 379 F.3d at 1262. The court then held that a case is pending "when it is actually being considered by the state habeas court and during the gap of time between the state habeas court's initial disposition and the petitioner's timely filing of a petition for review at the next level." *Id.*

Similarly, in <u>Jones</u> the circuit court again quoted from <u>Saffold</u>, stating that "pending . . . cover[s] the time between a lower state court's decision and the filing of a notice of appeal to a higher state court." 349 F.3d at 1307-08.

In the instant case, 288 days of the federal limitations period expired from February 17, 2002, the date Petitioner's conviction became final, to December 2, 2002, the date he filed his Rule 3.850 motion. The limitations period was tolled during the period that Petitioner's Rule 3.850 motion was pending. Respondent argues that the motion was pending until March 28, 2005, the date of issuance of the First DCA's mandate. Petitioner contends that the motion was pending until April 25, 2005, the date of the First DCA's denial of Petitioner's Motion for Rehearing/Request for Written Opinion (Doc. 18 at 3-5). Petitioner concedes that the motion for rehearing was filed after the 15-day period for filing such motions provided by Rule 9.330(a) of the Florida Rules of Appellate Procedure; however, Petitioner argues that the motion was not improperly filed because the First DCA had jurisdiction to rule on it and did in fact rule on it instead of striking it as untimely or improperly filed (*id*., at 4-5).

Regardless of whether the Rule 3.850 motion was pending until March 28, 2005 or April 25, 2005, Petitioner's federal petition was timely. Assuming arguendo that Petitioner's Rule 3.850 motion was pending only until March 28, 2005, the date of issuance of the appellate court's mandate, Petitioner's federal petition was filed 59 days later, on May 26, 2005 (Doc. 1 at 7). Thus, only 347 days of the 365-day federal limitations period elapsed (288 + 59). Accordingly, the instant petition is timely. Having reached this conclusion, the court will consider the merits of Petitioner's claim.

III.   STANDARD OF REVIEW

Section 2254(a) of Title 28 provides, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws of the United States." As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for federal habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19.

Section 2254 now provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (West Supp. 2001).

The United States Supreme Court explained the framework of review under § 2254(d)(1) in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[4] The appropriate test in habeas cases was described by Justice O'Connor as follows:

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412-13; Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119-20, 147 L. Ed. 2d 125 (2000).

---

[4]Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-75, 390-99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and –- except as to the footnote – Scalia) in part II (529 U.S. at 403-13). The opinion of Justice Stevens in Part II was joined by Souter, Ginsburg, and Breyer.

The Eleventh Circuit has developed a three-step process for applying the Williams test to any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal state court proceeding. *See* Wellington v. Moore, 314 F.3d 1256, 1260-61 (11th Cir. 2002); Robinson v. Moore, 300 F.3d 1320, 1343-45 (11th Cir. 2002). First, the court must ascertain the controlling legal principles that are clearly established by the Supreme Court at the time of the state court adjudication. Wellington, 314 F.3d at 1260; Robinson, 300 F.3d at 1343. Second, the court must determine whether the state court adjudication was contrary to the clearly established Supreme Court law. Wellington, 314 F.3d at 1260, Robinson, 300 F.3d at 1344. "The 'contrary to' clause in § 2254(d)(1) 'suggests that the state court's decision must be substantially different' from the relevant Supreme Court precedent." Wellington, 314 F.3d at 1260 (quoting Fugate v. Head, 261 F.3d 1206, 1216 (11th Cir. 2001), *cert. denied*, 535 U.S. 1104, 122 S. Ct. 2310, 152 L. Ed. 2d 1065 (2002) (quoting Williams, 529 U.S. at 405)). "Although a state court's decision that 'applies a rule that contradicts' the governing Supreme Court law is 'contrary,' a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law." Wellington, 314 F.3d at 1260 (citing and quoting Williams, 529 U.S. at 404-06). If the state court applied the correct Supreme Court precedent, and the United States Supreme Court, faced with materially indistinguishable facts, has not reached a decision different from the decision reached by the state court in the petitioner's case, the case does not fit within the "contrary to" clause, and the federal habeas court must proceed to the third step and determine whether the state court "unreasonably applied the relevant Supreme Court authority." Fugate, 261 F.3d at 1216. Likewise, if the facts of the Supreme Court cases and the petitioner's case are <u>not</u> substantially similar, "a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law." *Id.* (citing and quoting Williams, 529 U.S. at 406). A state court is not required to cite Supreme Court cases or even be aware of the cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).

The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 410. The Supreme Court has explained that "a federal habeas court may not issue a writ under the unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Bell v. Cone, 535 U.S. 685, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002) (quoting Williams, 529 U.S. at 411). Indeed, "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Lockyer v. Andrade, 538 U.S. 63, 123 S. Ct. 1166, 1175, 155 L. Ed. 2d 144 (2003). A state court's incorrect application of clearly established law will be held to be reasonable and not warrant a writ unless "thorough analysis by a federal court produces a firm conviction that that [the state court] judgment is infected by constitutional error." Williams, 529 U.S. at 389. "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." Yarborough v. Alvarado, 541 U.S. 652, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004) (citation omitted). Although § 2254(d)(1) is concerned only with federal law as clearly established by the Supreme Court, this court may look to circuit precedent to demonstrate reasonable applications of Supreme Court precedent. Van Poyck v. Fla. Dep't of Corrections, 290 F.3d 1318, 1322 n.4 (11th Cir. 2002).

In deciding whether a state court decision involved "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding" under § 2254(d)(2), determinations of fact are "presumed to be correct," unless the presumption is rebutted by Petitioner "by clear and convincing evidence." Section 2254(e)(1); *see* Miller-El v. Cockrell, 537 U.S. 322, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." (dictum)); Fugate, 261 F.3d at 1215 (quoting 28 U.S.C. § 2254(e)(1)); Parker v. Head, 244 F.3d 831, 835-36 (11th Cir. 2001) (citing § 2254(d)(2) and (e)(1)); *see also* Crawford v. Head, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides

a "highly deferential standard of review" of the state court's factual determinations).  Thus, not only must the state court's factual determination have been unreasonable, but the court's factual findings must be shown unreasonable by clear and convincing evidence.  *See* Callahan v. Campbell, 427 F.3d 897, 926 (11th Cir. 2005) (citing § 2254(e)(1); Rutherford v. Crosby, 385 F.3d 1300, 1308 (11th Cir. 2004) (concluding that "[petitioner] has not shown by clear and convincing evidence that the Florida Supreme Court's factual finding . . . [wa]s unreasonable in light of the evidence in the state court record")).

Within this framework, the court will review Petitioner's claim.

IV.	PETITIONER'S CLAIM

Petitioner claims that he received ineffective assistance of counsel because his trial counsel failed to properly cross-examine Teresa Aguilar, the mother of the victim (Doc. 4 at 4, attached pages; Doc. 7).  Petitioner states that prior to trial, Ms. Aguilar gave a statement to law enforcement which included details that allegedly conflicted with the victim's trial testimony as to how the offense occurred (*id*.).  Specifically, Petitioner asserts that the victim testified that on the night before she revealed the sexual abuse to her mother, Teresa Aguilar, she (the victim) was sleeping on the couch, and Teresa Aguilar was sleeping on the floor; however, Ms. Aguilar told police that she and the child were on the floor, and Petitioner was sleeping on the couch (Doc. 7 at 18).  Additionally, the child testified that that night Petitioner took her (the victim) into his bedroom, and she and Petitioner remained there until she woke up in the morning and Petitioner was sexually assaulting her; but Teresa Aguilar told police that she took the child to the bedroom at 4:30 a.m. and slept with her, while Petitioner slept on the couch all night (*id*.).  Petitioner submitted a copy of Ms. Aguilar's statement to police (Doc. 10, Ex. B).  Petitioner contends that cross-examination of Teresa Aguilar regarding her statement to law enforcement was crucial to impeaching the victim's credibility, and because the victim was the only eyewitness, the result of the trial would have been different if counsel had conducted proper cross-examination (*id*. at 20).

A.	Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L. Ed. 2d 674 (1984).  To obtain relief under Strickland, a petitioner must show (1) deficient performance by counsel and (2) a reasonable

probability that, but for counsel's deficient performance, the result of the proceeding would have been different. 466 U.S. at 687-88. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). If a petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. Strickland, 466 U.S. at 697. Thus, this court need not address the prejudice prong if the court determines that the performance prong is not satisfied. Turner v. Crosby, 339 F.3d 1247, 1279 (11th Cir. 2003), *cert. denied*, 541 U.S. 1034, 124 S.Ct. 2104, 158 L. Ed. 2d 718 (2004); Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa." (citation omitted)).

> Trying cases is no exact science. And as a result, we must never delude ourselves that the fair review of a trial lawyer's judgment and performance is an activity that calls for great precision or for a categorical approach. When reviewing whether an attorney is ineffective, courts "should always presume strongly that counsel's performance was reasonable and adequate." Atkins v. Singletary, 965 F. 2d 952, 958 (11th Cir. 1992). And, "a court should be highly deferential to those choices . . . that are arguably dictated by a reasonable trial strategy." Devier v. Zant, 3 F. 3d 1445, 1450 (11th Cir. 1993). Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it can be shown that no reasonable lawyer, in the circumstances would have done so.

Rogers v. Zant, 13 F. 3d 384, 386 (11th Cir. 1994); Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001) (to show counsel's performance was unreasonable, defendant must establish that no competent counsel would have taken the action that his counsel did take); Chandler, 218 F.3d at 1313 (issue is not what is possible, prudent, or appropriate, but what is constitutionally compelled) (citing Burger v. Kemp, 483 U.S. 776, 107 S. Ct. 3114, 3126, 97 L. Ed. 2d 638 (1987)).

However, not every strategic decision passes constitutional muster. Whether a particular decision by counsel was a tactical one is a question of fact, Hardwick v. Crosby, 320 F.3d 1127, 1163 (11th Cir. 2003), and the state court's resolution of that issue enjoys a strong presumption of correctness. *See* 28 U.S.C. § 2254(e)(1); Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995);

Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991). Whether a particular tactical decision was a reasonable one, however, is a question of law, Hardwick 320 F.3d at 1163; Jackson, 42 F.3d at 1367; Horton, 941 F.2d at 1462. In determining whether counsel's decision was reasonable, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high. Wellington, 314 F.3d at 1260. The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" Id. (quoting Strickland, 466 U.S. at 693). However, the Court has also clarified that a petitioner need not demonstrate it 'more likely than not, or prove by a preponderance of evidence,' that counsel's errors affected the outcome. Strickland, 466 U.S. at 693-94. Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Id. at 694. Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence. Williams v. Taylor, 529 U.S. at 405-406.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694-95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given,

and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.

*Id.* at 695-96.

  B. <u>Federal Review of State Court Decision</u>

  Petitioner raised his claim in his Rule 3.850 motion (Doc. 15, Ex. J at 153-157). Following an evidentiary hearing, at which Petitioner was represented by counsel, the state court denied the claim (*id*. at 219-21). In the state court's written decision denying the motion, the court analyzed whether Petitioner satisfied the two-prong <u>Strickland</u> standard (*id*. at 219). Because the state court explicitly identified and applied the <u>Strickland</u> standard, and the state court did not reach a decision different from the Supreme Court in a case with indistinguishable facts, Petitioner cannot show the state court decision was "contrary to" <u>Strickland</u>. Therefore, he is entitled to federal habeas relief only if he establishes the state court's denial of his claim was based upon an unreasonable determination of the facts, or an unreasonable application of <u>Strickland</u>.

  The state court decision contained the following factual findings:

  1. The State never questioned Teresa Aguilar on direct examination concerning what happened on the date in question but focused on the facts and circumstances surrounding the date when the child revealed to the mother that she had been molested by the defendant.

  2. On cross-examination, defense counsel managed to bring out the following facts:

   a. the child was never alone with the defendant;

   b. the child had a chronic vaginal infection which the mother treated by applying Monostat with an inserter;

   c. an incident occurred where a three-year-old child of one of Teresa Aguilar's friends was found nude on top of the victim, and

   d. for nearly one month, Teresa Aguilar and the defendant slept on the floor, and during that time the victim sometimes slept with them.

        3.       Teresa Aguilar's testimony was presented by the State prior to the victim's testimony.

(*id*. at 219-21). The state court determined that defense counsel would not have been permitted to cross-examine Teresa Aguilar about her statement to law enforcement because such questioning was beyond the scope of direct examination, and those facts were not yet established by any testimony by the victim (*id*.). The state court concluded that because the cross-examination suggested by Petitioner would not have been permitted by the trial court, Petitioner could not establish that defense counsel's performance was substandard (*id*. at 221).

      The trial transcript shows that Teresa Aguilar testified on direct that on May 16, 1999, while she was giving her four-year-old daughter Destiny a bath, Destiny told her that Petitioner had been touching her "pee-pee" at night (Doc. 15, Ex. L at 41-42). Ms. Aguilar testified that after Destiny told her about the touching, she questioned her two or three times, and then called Cassie Medina to transport Destiny and her to the hospital (*id*. at 42). Ms. Aguilar testified that she had met Petitioner in February of 1999; they were married on April 3, 1999; and they lived together with the victim in a trailer on Magnolia Drive from March to May of 1999 (*id*. at 43-44). She testified that prior to May 16, the family was happy, and Destiny loved Petitioner and "took up with him right off the bat" (*id*. at 45-46).

      On cross-examination, defense counsel elicited testimony that on May 16, the family spent the day together at a park, and Ms. Aguilar did not notice any behavior that indicated Destiny was frightened of Petitioner (*id*. at 47-48). Ms. Aguilar testified that Petitioner was never alone with Destiny (*id*. at 49-50). Defense counsel elicited testimony that Destiny had had chronic vaginal problems and urinary tract infections since birth, and Ms. Aguilar treated the conditions with antibiotics which were twice administered by placing an applicator at the tip of Destiny's vagina, and once in the form of drops directed into the vagina (*id*. at 51-52, 56). Defense counsel elicited testimony that Destiny experienced painful burning during the infections and kicked and screamed the first time Ms. Aguilar administered the medicine (*id*. at 51-52). Ms. Aguilar testified that Destiny was suffering from an infection in March and April of 1999, the months before the sexual battery (*id*. at 52, 55). Defense counsel elicited testimony from Ms. Aguilar that she was a protective mother, that she and Petitioner had a healthy marital life, and that she was shocked when

Destiny reported the sexual battery (*id*. at 53). Counsel also elicited testimony from Ms. Aguilar that she and Destiny lived with family friends, the Medinas, for approximately one month, and during that time she discovered the Medina's three-year-old son lying naked on top of Destiny (*id*. at 54-55, 58).

On re-direct, Ms. Aguilar testified that on one occasion, she found Petitioner in Destiny's bed with the victim (*id*. at 58-59). Destiny was wearing a t-shirt and panties, and Petitioner was wearing his underwear (*id*. at 59).

Dr. Rachesky testified that she examined Destiny on May 18, 1999, and found a tear in the child's hymen at the "6 to 7 o'clock position and a "rectal tag" at the "noon" position (*id*. at 23-24). Dr. Rachesky did not observe a laceration in the rectal area, but she testified that lacerations in that area heal very quickly, commonly in a day (*id*. at 25). Dr. Rachesky testified that the location of the hymenal tear was an "exceedingly uncommon" area for an accidental injury, and even the insertion of tampons does not cause a disruption to the hymen (*id*. at 27-28). Dr. Rachesky testified that the tear to Destiny's hymen was consistent with the child's statement that the injury was the result of penile contact (*id*. at 28).

Dr. Williams testified that she examined Destiny on May 16, 1999 (*id*. at 65). She observed a thick, white discharge near the hymen, inflamed tissue of the hymen, a perforation at the "5 to 6 o'clock" position, a rectal skin tag, and a superficial laceration next to the skin tag (*id*. at 67-68). Dr. Williams stated that Teresa Aguilar had reported that Destiny had the skin tag for quite some time (*id*. at 68). The doctor testified that any injury to the hymen that appears between the 3 and 9 o'clock position, but most specifically the 6 o'clock position, is "highly indicative" of sexual abuse and penetration (*id*. at 71).

On cross-examination, Dr. Williams testified that a hymenal tear could be caused by a blunt object, like a crayon or pen, inserted with force into the child's vagina (*id*. at 73). She also testified that if Destiny had been fully penetrated by a penis the day before her examination, the doctor would expect to see some swelling, but she did not observe any swelling on the victim (*id*. at 79). Dr. Williams testified that urinary tract infections in children are not indicative of sexual abuse (*id*. at 81-82). Additionally, the victim's vaginal infection was not indicative of sexual abuse (*id*. at 83).

Destiny Scott, the victim, was six years old at the time of trial. She testified that she told her mother that Petitioner was rubbing her "pee-pee," meaning the front of her private part (*id*. at 119-20). She testified that it happened at night in Petitioner's room (*id*. at 120). She stated that there was a dresser and a window in his room (*id*.). She testified she was wearing a shirt and panties, and he was wearing a t-shirt and underwear (*id*. at 120-21). She stated that he picked her up when she was asleep, took her into his room, laid her down, and rubbed her pee-pee (*id*.). She said that her clothes were on (*id*. at 122). She testified that he put his penis inside her in her front and rear private parts (*id*.). She said she did not tell him to stop because she was asleep (*id*.). She stated she woke up in the morning and he "was still doing it" (*id*. at 123). She stated that this happened "like everyday" (*id*. at 122). She testified that she liked Petitioner, and she felt "really good" when her mother married him (*id*. at 123).

On cross-examination, defense counsel elicited testimony from Destiny that before Petitioner took her into his room, she was sleeping on the couch and her mother was sleeping on the floor close to her (*id*. at 129-30). She testified that she and her mother were sleeping when Petitioner picked her up, and her mother did not wake up (*id*. at 130). Destiny testified that she did not see what Petitioner was doing to her because she was on her side on the bed, and he was behind her (*id*. at 131). She stated she was asleep at the time (*id*.). She testified that "it" felt like a roach on her back (*id*.). She stated that while Petitioner was rubbing her, she was facing the window (*id*. at 132). Defense counsel asked, "And are you looking out in the back yard through the window?" and Destiny responded, "Uh huh." (*id*.).

Defense counsel elicited testimony from Cassie Medina, a friend of Teresa Aguilar, that the window in the master bedroom was covered with an air conditioner and plywood (*id*. at 102).

Charles Byron, a physician's assistant, testified that he examined Destiny on March 11, 1999, and treated her for a urinary tract infection (*id*. at 137-40). Destiny's mother had also reported vaginal discharge (*id*.). On May 3, he saw the child again, and the child's mother said she had been treating the child's vaginal area with cream, and that the child had severe itching in the rectal area (*id*. at 141). Mr. Byron observed discharge and mild redness of the external genitalia (*id*.). He examined Destiny again on May 13, but conducted only an external examination (*id*. at 143). He did not observe any lacerations, bleeding or prior scarring (*id*.).

The trial transcript supports the state court's determination that defense counsel's questioning Teresa Aguilar regarding where she, the child, and Petitioner slept on the night of May 15, 1999, and who took the child into the bedroom that night was beyond the scope of Ms. Aguilar's testimony on direct. However, defense counsel questioned Ms. Aguilar on other matters outside her direct testimony, for example, the child's medical history and the incident involving the three-year-old boy, with no objection from the prosecutor or limitation by the court. Thus, it does not appear that questioning by defense counsel regarding the areas identified by Petitioner would have been excluded. However, even if defense counsel could have asked Ms. Aguilar details about the sleeping arrangements the night before Destiny reported the abuse, counsel's failure to do so did not render her performance substandard. The theory of defense was that the child's injuries could have been caused by something or someone other than Petitioner. Defense counsel elicited testimony from Ms. Aguilar that supported this theory, including the victim's medical problems involving her genital area; that a male child was discovered lying naked on top of the victim; that Petitioner was never alone with the victim; that the victim very much liked Petitioner; and that the victim did not act uncomfortable or fearful around Petitioner the day after the alleged sexual battery. The fact that defense counsel did not inquire of Ms. Aguilar regarding the sleeping arrangements the night before Destiny reported the abuse does not constitute an error that no reasonable attorney would have made.

Furthermore, Petitioner has failed to demonstrate a reasonable probability that the result of the trial would have been different if defense counsel had inquired of Ms. Aguilar regarding the sleeping arrangements on the night before Destiny's revelation. The amended information alleged that the sexual battery occurred between January 1, 1999 and May 16, 1999 (Doc. 16, Ex. J at 32). The victim testified that Petitioner sexually abused her on more than one occasion (Doc. 16, Ex. L at 122). The victim also testified that she sometimes fell asleep in the livingroom while watching movies (*id*. at 130). The victim's mother testified that the victim told her, "Antonio's been touching my pee-pee at night" (*id*. at 42). Ms. Aguilar also testified that on one occasion she found Petitioner in the victim's bed with her (*id*. at 58). Finally, and most damaging, was the expert testimony regarding the child's injuries and the consistency of those injuries with sexual abuse. In light of this evidence, there is no reasonable probability that a juror would have had reasonable doubt as to Petitioner's guilt if Ms. Aguilar had testified to the details of the sleeping arrangements the night

Case No.: 5:05cv112/RS/EMT

before the child reported the abuse.  Therefore, the state court decision was not based on an unreasonable determination of the facts, nor was it an unreasonable application of Strickland.

Accordingly, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that James R. McDonough is substituted for James V. Crosby as Respondent.

And it is respectfully **RECOMMENDED** that:

The amended petition for writ of habeas corpus (Doc. 4) be **DENIED**.

At Pensacola, Florida this 2nd day of August 2006.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**